COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.
2-06-210-CV

 

EAST HILL MARINE, INC. AND                                             APPELLANTS

JOE
STARK D/B/A JOE STARK MARINE

 

                                                   V.

 

RINKER BOAT CO., INC.                                                        APPELLEES

AND
GAVEN HUNT

 

                                              ------------

 

           FROM
THE 352ND DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

 

I.  Introduction








Appellants East Hill Marine,
Inc. and Joe Stark d/b/a Joe Stark Marine appeal the trial court=s order granting summary judgment to appellees Rinker Boat Co., Inc.
and Gaven Hunt.  In their first two
issues, appellants argue that the trial court erred by granting a traditional
summary judgment against them on their breach of contract claims and by
granting a traditional summary judgment and no-evidence summary judgment against
them on their Texas Occupations Code claims. 
In a third issue, East Hill Marine, solely, argues that the trial court
erred by granting a traditional summary judgment against it on its Deceptive
Trade Practices Act (ADTPA@) claim.  We affirm.

II.  Background Facts

In the early 1990s Stark
became an authorized Rinker Boats dealer in Fort Worth, Texas.  Stark and appellees did not enter into a
written agreement documenting the terms of the dealer agreement, but instead,
orally agreed that Stark could be the authorized dealer in Fort Worth for as
long as he wanted to with no minimum purchase requirements.  Stark continued to be a Rinker dealer in Fort
Worth until 2004.  During this time,
appellees listed Stark=s business
on its website as an authorized dealer and corresponded with Stark as a dealer.
Stark paid no money to appellees in exchange for this agreement.

On September 23, 2004,
appellees sent a letter to Stark informing him that they were terminating their
dealership agreement with him because of lack or loss of sales performance and
sub par performance in the areas of customer service and satisfaction.  The letter informed Stark that the agreement
would terminate in 90 days and appellees would honor any reasonable orders
within the 90-day period.








East Hill Marine entered into
a verbal dealer agreement with appellees in March 2004.  East Hill Marine claims that appellees made the
same oral representations to it that they had made to Stark; specifically, that
East Hill Marine would be the exclusive Rinker dealer in North Dallas for as
long as East Hill Marine wanted to be. 
East Hill Marine also claims that, under the agreement, East Hill Marine
did not have to purchase a minimum number of boats to remain a Rinker
dealer.  Larry Cochran, the president of
East Hill Marine, requested a written agreement, but appellees informed him
that they did not have a written agreement, nor would they provide him with
one.  Regardless, East Hill Marine became
a Rinker dealer and purchased boats from appellees for approximately seven
months.  Like Stark, East Hill Marine
paid no money to appellees to become an authorized dealer.  On November 1, 2004, appellees called East
Hill Marine and stated that they were terminating East Hill Marine=s dealership status.  On
December 13, 2004, appellants sued appellees for breach of their dealer
agreements and for violating the Texas Occupations Code as it relates to boat
dealers and manufacturers.  East Hill
Marine, solely, also asserted a claim against appellees under the DTPA.  In November 2005, appellees filed a
traditional motion for summary judgment on all three claims and an additional
no-evidence motion for summary judgment on the Occupations Code claims, all of
which the trial court granted.  This
appeal followed.

 








III.  Standards of Review

A.  Traditional Summary Judgment

A defendant who conclusively
negates at least one essential element of a cause of action is entitled to
summary judgment on that claim.  IHS
Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason, 143 S.W.3d
794, 798 (Tex. 2004); see Tex. R.
Civ. P. 166a(b), (c).  When
reviewing a summary judgment, we take as true all evidence favorable to the
nonmovant, and we indulge every reasonable inference and resolve any doubts in
the nonmovant=s
favor.  IHS Cedars Treatment Ctr.,
143 S.W.3d at 798. 

A defendant is entitled to
summary judgment on an affirmative defense if the defendant conclusively proves
all the elements of the affirmative defense. 
Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999); see
Tex. R. Civ. P. 166a(b),
(c).  To accomplish this, the
defendant-movant must present summary judgment evidence that establishes each
element of the affirmative defense as a matter of law.  Ryland Group, Inc. v. Hood, 924 S.W.2d
120, 121 (Tex. 1996).  When reviewing a
summary judgment, we take as true all evidence favorable to the nonmovant, and
we indulge every reasonable inference and resolve any doubts in the nonmovant=s favor.  IHS Cedars
Treatment Ctr., 143 S.W.3d at 798.

 








B.  No-Evidence Summary Judgment

After an adequate time for
discovery, the party without the burden of proof may, without presenting
evidence, move for summary judgment on the ground that there is no evidence to
support an essential element of the nonmovant=s claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence. 
Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 207
(Tex. 2002).  The trial court must grant
the motion unless the nonmovant produces summary judgment evidence that raises
a genuine issue of material fact.  See
Tex. R. Civ. P. 166a(i) &
cmt.; Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no-evidence
summary judgment, we examine the entire record in the light most favorable to
the nonmovant, indulging every reasonable inference and resolving any doubts
against the motion.  Sudan v. Sudan,  199 S.W.3d 291, 292 (Tex. 2006).  If the nonmovant brings forward more than a
scintilla of probative evidence that raises a genuine issue of material fact,
then a no-evidence summary judgment is not proper.  Moore v. K Mart Corp., 981 S.W.2d 266,
269 (Tex. App.CSan Antonio
1998, pet. denied).








When a party moves for
summary judgment under both rules 166a(c) and 166a(i), we will first review the
trial court=s judgment
under the standards of rule 166a(i).  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004).  If the nonmovant failed to produce more than
a scintilla of evidence under that burden, then there is no need to analyze
whether the movant=s summary
judgment proof satisfied the less stringent rule 166a(c) burden.  Id.

IV.  Texas Occupations Code

In their first issue,
appellants argue that the trial court erred by granting traditional and
no-evidence summary judgments against them on their Occupations Code claims.[1]  Appellees= no-evidence motion was based on the argument that the Occupations Code
requires a written agreement between a manufacturer and a dealer, and in this
case, there was no evidence of a written agreement between the parties.  Appellees= traditional summary judgment motion was based on the argument that
appellants were estopped and quasi-estopped from bringing their claims because
they violated the Occupations Code by not entering into a written contract.

A.  Applicable Law








The Occupations Code states
that a boat manufacturer may not terminate an agreement with a dealer unless
there is good cause for the termination. 
Tex. Occ. Code Ann. ' 2352.053(a) (Vernon 2004). 
Section 2352.051 further requires that a boat manufacturer and a dealer
enter into an agreement that complies with section 2352.052.  See id. ' 2352.051.  Under section
2352.052, the agreement must contain the following terms: 

(1)  the dealer=s location, territory, or
market area; 

(2)  the length of the agreement; 

(3)  any performance or marketing standards; 

(4)  any working capital, inventory, facility,
equipment, or tool standards; 

(5)  provisions for termination or nonrenewal of
the agreement and the designation of a successor dealer in the event of the
dealer=s
death or disability; 

(6)  the obligations of the manufacturer,
distributor, and dealer in the preparation and delivery of and warranty service
on new boats and new outboard motors; 

(7)  the obligations of the manufacturer,
distributor, and dealer on termination of the agreement, including inventory of
new boats and new outboard motors, parts inventory, equipment, furnishings,
special tools, and required signs; and

(8)  dispute resolution
procedures.

 

Id. '
2352.052(a).  Section 2352.001 of the
Occupations Code defines Aagreement@ as a Awritten agreement between a manufacturer . . . and a dealer for the purchase
and sale of new boats or new outboard motors.@  Id. ' 2352.001(1) (emphasis added).

B.  Analysis








Under section 2352.051, a
dealer and a manufacturer have a mutual obligation to enter into a written
agreement before selling or buying boats. 
See id. '' 2352.001,
.051.  Appellants argue that section
2352.053 Aprovides
that a manufacturer such as Rinker may not terminate dealers such as
[appellants] unless there exists good cause.@  [Emphasis added.]  However, the statute actually states that a
manufacturer Amay not
terminate an agreement unless there is good cause.@  Id. ' 2352.053(a) (emphasis added). 
While appellants may be correct that the Occupations Code was designed
to protect small boat dealers from large and powerful manufacturers, the clear
language of the statute requires both parties to enter into a written agreement.  See id. ' 2352.051.  Therefore, any
verbal agreements between appellants and appellees are not subject to section
2352.053=s prohibition on termination without good cause.  See id. '' 2352.001, .053.








Appellants next claim that
various pieces of correspondence, purchase orders, purchase invoices, and other
documents were sufficient to constitute written agreements between them and
appellees.  However, appellants failed to
demonstrate to the trial court how these various documents satisfied the Occupation
Code=s eight requirements for written agreements.  See id. ' 2352.052(a).  Further,
appellants conceded in their depositions and petition that no written
agreements existed.  Appellants also
claim that even if there were no written agreements, section 2352.052(b) makes
the Occupations code applicable to their oral agreement, and thus required Athat there be protections afforded [appellants] from unilateral,
draconian termination by Rinker.@  Section 2352.052(b) states
that Aa dealer agreement and any transaction subject to this chapter must
comply with the requirements of this section.@  Id. ' 2352.052(b).  We disagree
with appellants=
interpretation; section 2352.052(b) refers to Athis chapter,@ meaning
chapter 2352 of the Occupations Code and its corresponding sections.  Under section 2352.001(1), all agreements
under chapter 2352 must be in writing.  Id.
' 2352.001(1).  Thus, section
2352.052(b) applies only to written agreements.   

Since there were no
agreements complying with the Occupations Code, appellees could not have
violated section 2352.053, and the trial court did not err by granting
appellees= no-evidence
motion for summary judgment on those claims. 
See id. '
2352.051.  Because the no-evidence
summary judgment against appellants was proper, we need not analyze whether the
trial court erred by granting traditional summary judgment in favor of
appellees on those claims.  See Ford
Motor Co., 135 S.W.3d at 600. 
Accordingly, we overrule appellants= first issue. 

V.  Breach of Contract Claims








In their second issue,
appellants claim that the trial court erred by granting summary judgment in
favor of appellees on their statute of frauds defenses to appellants= breach of contract claims. 
Appellees= statute of
frauds defenses included two reasons why the verbal contracts were
unenforceable: the contracts were for the sale of goods over $500 and the
contracts could not be completed within one year.  We only address the sale of goods argument
because it is dispositive.

A.  Applicable Law

A contract for the sale of
goods valued at more than $500 is subject to the statute of frauds.  Tex.
Bus. & Comm. Code Ann. ' 2.201(a) (Vernon
1994).  Where a contract contains a
mixture of sales and services, section 2.201 applies if the sale of goods is
the Adominant factor@ or Aessence@ of the
transaction.  See Cont=l Casing Corp. v. Siderca Corp., 38 S.W.3d
782, 787 (Tex. App.CHouston
[14th Dist.] 2001, no pet.); WesTech Eng'g, Inc. v. Clearwater
Constructors, Inc., 835 S.W.2d 190, 197 (Tex. App.CAustin 1992, no
writ).  Appellees and
appellants dispute whether the thrust of each contract was the dealership
agreement or the sale and purchase of goods. 
Thus, to determine whether section 2.201(a) applies here, we must decide
whether the dominant factor or essence of each
alleged agreement is a Acontract for the sale of goods.@  See Tex. Bus. & Comm. Code
Ann. ' 2.201(a); Cont=l Casing Corp., 38 S.W.3d at 787.

B.  Analysis 








Appellants argue that they
made oral agreements with appellees that authorized them to purchase boats
indefinitely.  According to appellants,
these agreements did not involve the purchase of goods for an amount over $500,
but instead were agreements that they would act as appellees= boat dealers.  Thus, argue
appellants, the contracts were for services, not for goods.  We disagree.

First, the boats to be supplied by appellees were without question Agoods@ as defined by the
Business and Commerce Code (AUCC@).  See Tex. Bus. & Comm. Code Ann. ' 2.105. The UCC states
that a Acontract for sale@ includes both a
present sale of goods and a contract to sell goods at a future time.  Id. ' 2.106.  

Appellants admitted that the
main purpose of their agreements with appellees was to buy boats that cost over
$500 from appellees and then sell those boats in their own showrooms.  For example, Stark testified:

Q. On the boats that you have
purchased from Rinker over the years, have any of them been under $500?

 

A.  No.

 

Q. What would be the lowest
price of one of the boats that you purchased from Rinker?

 

A. We bought a C in
1992, they had an 18-foot boat that sold for approximately $16,000, dealers
cost.

 

Q. That=s
what you paid Rinker for the boat?

 

A. Yes sir.

 

Q. That=s the
lowest price of a boat you can remember buying from them?








A. Yes, sir.

 

Q. Is the main gist of the
agreement between you and Rinker was for you to buy boats from them?

 

A. I guess so.

 

Q. You many have other
accessories to go with it, but the main gist of your agreement with Rinker was
that you would buy boats from them as you contend for as long as you wanted?

 

A. Yes, sir.

 

In
discussing East Hill Marine=s contentions as to the terms of the oral agreement, East Hill Marine=s president testified as follows,

Q. What were Rinker=s
obligations?

 

A. To manufacture and deliver
boats.  To assist in marketing
materials.  We discussed having boats
with birthdays and would they assist in disposing of those.  All the obligations any manufacturer
has.  

 

Q. Well, what were the
obligations you agreed upon?

 

A. That I would be the Dallas
dealer exclusively.  That if and when
they expected Joe Stark to go away, that I would have part of Fort Worth also.

 

Q. Any other obligations y=all
agreed upon for Rinker?

 

A. I don=t
recall.

 

Q. What were your
obligations, East Hill=s?

 

A. Basically looking for a
floor plan, insurance, a good location. 
Take it to the Boat Show, represent the line.  

 








. . . . 

 

Q. You=ve
already told me that there wasn=t a written agreement,
correct?

 

A. Correct.

 

Q.  Did you ever offer to purchase new boats or
actually purchase new boats from Rinker without having a written agreement?

 

A. Yes.

 

Q. Your claims against Rinker
involved, in part, a transaction in which you claim you ordered $575,000 in new
units; is that correct?

 

A. I had more orders than
that.

 








Further, the alleged oral agreements are
properly characterized as distributorship agreements.  Although only one Texas case[2]
has discussed whether a distributorship agreement is a Acontract for the
sale of goods@ under the UCC, the overwhelming majority
of jurisdictions that have considered the question have concluded that
distributorship agreements are subject to the UCC.[3]
 We will follow the majority rule in holding
that the dominant factor or essence of each of the alleged agreements in this
case was a contract for the sale of goods, and thus each was subject to the
UCC.








We conclude
that appellants= arguments
that there were sufficient writings to constitute agreements under the UCC are
unpersuasive, especially in light of the admissions in their depositions and
pleadings that no written contracts existed between any parties.  Therefore, because the contracts were for the
sale of goods over $500, and the contracts were not in writing, the trial court
properly granted summary judgment in favor of appellees on this statute of
frauds defense.  See Tex. Bus. & Comm. Code Ann. ' 2.201(a).  This holding disposes of the entire issue, so
we need not address whether summary judgment was proper on the ground that the
contracts could not be performed within one year.  Accordingly, we overrule appellants= second issue. 

VI.  DTPA Claim

East Hill
Marine was the only appellant that asserted a DTPA claim against
appellees.  The trial court granted
traditional summary judgment in favor of appellees on this claim, holding that
the set of transactions between East Hill Marine and appellees involved
consideration of more than $500,000.    

A.  Applicable Law

The Texas
Business and Commerce Code exempts from the DTPA causes of action arising from
a transaction or set of transactions relating to the same project if the total
consideration by the consumer amounts to more than $500,000.  Id. ' 17.49(g) (Vernon
Supp. 2006).  The purpose of this
exemption is to maintain the DTPA as a viable source of relief for consumers in
small transactions and to remove litigation between businesses over large
transactions from the scope of the DTPA. 
See Citizens Nat=l Bank v. Allen Rae Invs., Inc., 142 S.W.3d
459, 473-74 (Tex. App.CFort Worth
2004, no pet.). 








B.  Analysis

In the
following portion of his deposition, East Hill Marine=s president, Larry Cochran, admitted that East Hill Marine=s damages claims against appellees involved total consideration of at
least $859,513:

Q.  So was setting up and running East Hill and
buying boats your . . . your project?

 

A. Uh-huh

 

Q. Is that a Ayes@?

 

A. AYes.@  Sorry.

 

. . . .

 

Q. Your claims against Rinker
involved, in part, a transaction in which you claim you ordered $575,000 in new
units; is that correct?

 

A. I had more orders than that.

 

. . . .

 

Q. But my question is, your
claims in this lawsuit involve, in part, a transaction which you claim you
ordered $575,000 or more in new units?

 

A. Yes.

 

Q. And that=sCthat
figure was money that you were going to pay Rinker to purchase boats so that
you could then sell them on to end customers?

 

A. Yes.

 








. . . .

 

Q. So yourCclaims,
in part, arise out of a claim for $859,513 in orders?

 

A. And quite possibly there
was more, but that=s
what I had here.

 

In its
petition, East Hill Marine sought recovery of ten years of lost profits, which
would have included the lost profits on the $859,513 that East Hill Marine
promised to pay appellees for boats.  In
order to avoid the DTPA exemption for transactions over $500,000, however, East
Hill Marine argues that the sole transaction it is suing appellees on under the
DTPA is its application to sell Rinker boats. 
According to East Hill Marine, at the time the dealer relationship was
established, there was no promise to pay more than $500,000; instead, there was
an agreement under which East Hill Marine could theoretically never purchase a
boat.

This
argument fails to address the fact that within months after East Hill Marine
established its initial agreement with appellees, East Hill Marine promised to
pay at least $859,513 for new boats. 
Hence, East Hill Marine did not apply to sell Rinker boats so that it
could simply have that option and never use it; it applied to be a Rinker boat
dealer so that it could purchase boats and then sell them in its showroom for
profits.








Because East
Hill Marine promised to pay appellees $859,513 and then sued to recover the
lost profits on this amount, East Hill Marine=s transactions with appellees exceed the $500,000 limit imposed by the
DTPA.  See Citizens Nat=l Bank, 142 S.W.3d at 473 (holding
that sets of transactions related to the same project can be valued
collectively under the DTPA).  The trial
court did not err by granting traditional summary judgment on East Hill Marine=s DTPA claim.  Accordingly, we
overrule East Hill Marine=s third
issue.

VII.  Conclusion

Having
overruled all three issues, we affirm the trial court=s summary judgment order.

                                                        

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL A:   CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

 

DELIVERED: June 21, 2007











[1]Appellants
sought damages against appellees for terminating their dealership agreements
without good cause and without written notice. 






[2]See
Cont=l
Casing Corp., 38 S.W.3d at 787-88 (holding that an agreement
between a pipe manufacturer and a dealer was a distributorship agreement and
was covered under the UCC).





[3]The courts in at least eighteen
jurisdictions have applied the UCC to distributorship agreements.  See AKA Distrib. Co. v. Whirlpool Corp.,
137 F.3d 1083, 1085 (8th Cir. 1998) (applying Minnesota law); Am. Suzuki
Motor Corp. v. Bill Kummer, Inc., 65 F.3d 1381, 1385-86 (7th Cir. 1995) (applying
Wisconsin law); Intercorp, Inc. v. Pennzoil Co., 877 F.2d 1524, 1527-28
(11th Cir. 1989) (applying Alabama law); Monarch Beverage Co. v. Tyfield
Imps., Inc., 823 F.2d 1187, 1190 (7th Cir. 1987) (applying Indiana law); Corenswet,
Inc. v. Amana Refrigeration, Inc., 594 F.2d 129, 134 (5th Cir. 1979)
(applying Iowa law); L & M Enters., Inc. v. BEI Sensors & Sys. Co.,
45 F. Supp.2d 879, 885 (D. Kan. 1999), aff'd, 231 F.3d 1284 (10th Cir.
2000) (applying Kansas law); Glacier Optical, Inc. v. Optique Du Monde,
Ltd., 816 F. Supp. 646, 652-53 (D. Or. 1993), aff'd, 46 F.3d 1141
(9th Cir. 1995) (applying Washington law); Paulson, Inc. v. Bromar, Inc.,
775 F. Supp. 1329, 1333 (D. Haw. 1991) (applying Hawaii law); Babst v. FMC
Corp., 661 F. Supp. 82, 87-88 (S. D. Miss. 1986) (applying Mississippi
law); Artman v. Int=l Harvester Co., 355 F. Supp. 482, 486 (W.D. Pa. 1973) (applying
Pennsylvania law); PCS Joint Venture, Ltd. v. Davis, 465 S.E.2d 713, 714
(Ga. Ct. App. 1995); Leibel v. Raynor Mfg. Co., 571 S.W.2d 640, 643 (Ky.
Ct. App. 1978); Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc., 454
A.2d 367, 376 (Md. Ct. Spec. App. 1983); Meuse-Rhine-Ijssel Cattle Breeders
of Canada, Ltd. v. Y-TEX Corp., 590 P2d 1306, 1310-11 (Wyo. 1979)
(concluding that a distributorship is not contemplated within the UCC
definition of Agoods@); Custom Commc=ns Eng'g, Inc. v. E.F. Johnson Co., 636 A.2d 80, 84-85 (N.J. Super.
Ct. App. Div. 1993); United Wholesale Liquor Co. v. Brown-Forman Distillers
Corp., 775 P.2d 233, 235-36 (N.M. 1989); Sanyo Elec., Inc. v. Pinros
& Gar Corp., 174 A.D.2d 452, 453 (N.Y. App. Div. 1991); Quality
Performance Lines v. Yoho Auto., Inc., 609 P.2d 1340, 1342 (Utah 1980).