**2025 UT App 11**

THE UTAH COURT OF APPEALS

MATT GREENE, JULIANN GREENE, AND MJG INVESTMENTS LLC,
Appellants,
*v.*
STEPHEN MONGIE; LINKS CONSULTING, LLC; LINKSCG, LLC; JOEL
SYBROWSKY; LODGING DYNAMICS DEVELOPMENT, LLC;
AND DYNAMIC CITY CAPITAL, LLC,
Appellees.

Opinion
No. 20230414-CA
Filed January 30, 2025

Fourth District Court, Spanish Fork Department
The Honorable Jared Eldridge
No. 200300159

Jefferson W. Gross, S. Ian Hiatt, and Seamus W.
Appel, Attorneys for Appellants

Troy L. Booher, Caroline A. Olsen, and Nate D.
Ashcraft, Attorneys for Appellee Stephen Mongie

Nate D. Ashcraft, Attorney for Appellee Links
Consulting, LLC

Daniel K. Brough and Ryan M. Merriman,
Attorneys for Appellee LinksCG, LLC

Evan S. Strassberg, Attorney for Appellees Joel
Sybrowsky, Lodging Dynamics Development, LLC,
and Dynamic City Capital, LLC

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

OLIVER, Judge:

¶1     After receiving a large sum of money from selling his
equity in a business, Matt Greene enlisted his friend Stephen

Mongie to help him invest the money. Under Mongie's guidance, Greene bought a life insurance policy from Mongie and invested two million dollars in a new fund created by Lodging Dynamics Development, LLC (Lodging Dynamics), a company led by Mongie's longtime friend Joel Sybrowsky. When the fund failed to perform as well as Greene expected, he filed suit, asserting claims for fraud, breach of fiduciary duty, negligence, breach of the covenant of good faith and fair dealing, and securities fraud. The district court granted summary judgment to the defendants on all claims, and Greene appealed. Because Greene has failed to establish that there is a genuine issue of material fact that would preclude summary judgment, we affirm the district court's ruling.

## BACKGROUND[1]

### *The Relationship Between Greene and Mongie*

¶2      A friend introduced Greene to Mongie in 2004 and told him that Mongie was well-connected in the investment advisory world. In 2005 or 2006, Mongie, a life insurance agent, formed Links Consulting, LLC, and within the next two years Michael Bergeron and Lowell Crabb, also life insurance agents, joined as partners. In 2009, Mongie and Bergeron formed LinksCG, LLC, a member-managed LLC. Mongie, Bergeron, and Crabb were managers of LinksCG. Although the stated purpose of LinksCG was "to provide financial services," only Crabb held the license required to serve as an investment advisor. Crabb provided his investment advisory services through a separate affiliation with Andina Capital Management (Andina), and none of the income from this work was paid to LinksCG. However, when any of the

---

1. "We recite the facts of the case and draw all reasonable inferences in the light most favorable to [Greene] as the nonmoving party." *Sampson v. HB Boys, LC*, 2024 UT App 56, n.1, 548 P.3d 538.

managers of LinksCG sold life insurance policies, the member manager who sold the policy would receive a large percentage of the premium as a commission, and the remainder would go to LinksCG as an override to pay overhead expenses and, occasionally, bonuses or niceties.

¶3     By 2014, Greene and Mongie had become friends. When Greene realized roughly eleven million dollars from selling his equity in a business, Greene asked Mongie to help him invest and manage the money. Mongie, with Crabb's assistance, created an asset allocation model to help manage Greene's wealth, which included creating the Matthew Aaron Greene Irrevocable Trust (the Trust) and MJG Investments, LLC (MJG). Mongie was named a successor co-trustee of the Trust, and he agreed to serve as manager of MJG as a personal favor to Greene, which he did without compensation. The MJG operating agreement included a limitation of liability provision stating that Mongie, as manager, could only be held liable for acts or omissions that were fraudulent, were in bad faith, or constituted gross negligence or willful misconduct.

*The Life Insurance Policy and the Hotel Fund Investment*

¶4     As part of the wealth management strategy, Mongie helped Greene obtain a life insurance policy with an annual premium of $250,000. The life insurance policy had an auto-renewal function where a loan was automatically created to pay the premium if the annual premium was not paid. Mongie received a large commission and LinksCG received an override from the sale of the life insurance policy.

¶5     In addition to helping Greene obtain a life insurance policy, Mongie also told Greene about a potential investment opportunity with Lodging Dynamics, a company that managed Marriott hotel properties and was led by Mongie's longtime friend Sybrowsky. Mongie's asset allocation model proposed that

the investment in Lodging Dynamics would cover the annual life insurance premium.

¶6      Lodging Dynamics owned and managed hotels that were funded by pooling funds of three to twelve investors. A separate "special purpose entity" owned each individual hotel. These special purpose entities were very successful and typically produced dividends of 12%–14% and returns on principal of 130% or more.

¶7      In 2013, Sybrowsky and Lodging Dynamics decided to create a new fund that bundled multiple hotel properties and began seeking investors. Mongie asked Crabb if they could include the Lodging Dynamics investment in their investment portfolio. Crabb had Andina review it, and Andina determined it was not a suitable investment because "[i]t was an emerging manager, their first fund, concentrated," and there was "[n]o track record." Crabb relayed this information to Mongie, but Mongie still decided to recommend the investment to Greene and other friends. Knowing that Greene was considering investing with Lodging Dynamics, Sybrowsky asked Mongie to set up a time for the three of them to meet.

¶8      At the meeting, Mongie, Sybrowsky, and Greene discussed LD Hotel Fund I, the new venture where multiple hotels would be bundled into a single investment vehicle. Sybrowsky also confirmed the historical returns generated by Lodging Dynamics's special purpose entities but made no promises or guarantees about a rate of return for LD Hotel Fund I. Greene "assumed that" the historical returns resulted from all of Lodging Dynamics's hotels being "held or acquired through funds rather than as individual properties." No one represented to Greene that the prior success of Lodging Dynamics involved bundled hotels, and he "didn't ask that question."

¶9 After the meeting, Greene received the Private Placement Memorandum (the PPM) and subscription agreement. The PPM described the nature of the investment and its associated risks. The risk factors included that the "COMPANY IS A START-UP ENTITY WITH NO HOTELS AND NO OPERATING HISTORY" and that only people able to "SUSTAIN A COMPLETE LOSS OF THEIR INVESTMENT, AND WHO HAVE NO NEED FOR LIQUIDITY WITH RESPECT TO THE FUNDS INVESTED," should invest due to the "HIGH DEGREE OF RISK." The subscription agreement stated that "[n]o representations or warranties have been made to the Investor by the Company, the Company or any agent of such persons, other than as set forth in the Memorandum (as amended and supplemented), the LLC Agreement (as amended) and this Agreement."

¶10 Despite receiving the PPM and subscription agreement more than six weeks before investing, Greene did not review either document because he was moving with his family to Costa Rica. Greene ultimately invested two million dollars with Lodging Dynamics in July 2014, one million through the Trust, and one million through MJG.

¶11 LD Hotel Fund I did not perform as well as Lodging Dynamics's previous special purpose entities and generated few dividends. On July 1, 2016, a premium loan was issued for the life insurance policy as the returns from LD Hotel Fund I were insufficient to cover the premium. Later in 2016, when Greene realized a loan was issued, he instructed Mongie to cancel the policy so another loan would not be issued to cover the premium. Instead of canceling the policy, Mongie advised Greene that he could find him replacement coverage, to which Greene agreed. However, Mongie did not find replacement coverage before the policy's automatic renewal date, and a second loan was issued to cover the premium on July 1, 2017. A few months later, Greene asked Mongie and Crabb to cancel the policy, which Mongie did immediately.

¶12    Around the same time, Greene reached out to Sybrowsky for an update on LD Hotel Fund I. Sybrowsky informed him that LD Hotel Fund I had been a disappointment and that Lodging Dynamics was working to sell the hotels to "recapture as much principal as possible." The following year, 2018, Sybrowsky formed Dynamic City Capital, LLC (Dynamic City), which was created to separate the development arm of Lodging Dynamics from the hospitality management arm. In 2019, Greene sent Sybrowsky an email demanding full and immediate repayment of his two million dollar investment in LD Hotel Fund I.

*The Alleged "Backscratching" Between Mongie and Sybrowsky*

¶13    As longtime friends, Mongie and Sybrowsky had ongoing communications and often helped each other. On two occasions—once in February 2014 and again in January 2015—Mongie asked Sybrowsky to provide him with a friends and family discount at Marriott hotels. Sybrowsky provided the discount to Mongie without asking for anything in return. And in late 2016, Mongie and Sybrowsky exchanged emails about the possibility of Mongie creating a financial model for Sybrowsky's mother's estate.

¶14    While trying to recover his principal from LD Hotel Fund I, Greene had a conversation with Crabb. During the conversation, Crabb informed Greene that LD Hotel Fund I was not an approved investment by Andina and that Mongie was not a licensed financial advisor. Crabb also informed Greene that he believed that Mongie and Sybrowsky were involved in "backscratching" where Mongie would bring in investors and in return Sybrowsky would direct his family and Lodging Dynamics employees to Mongie to purchase life insurance policies. However, Crabb testified that his belief that Mongie and Sybrowsky were involved in "backscratching" was a "[t]otal assumption."

*The Lawsuit*

¶15     Greene, the Trustee of the Trust (his wife, Juliann Greene), and MJG (hereinafter, collectively Greene) filed suit in November 2020. Greene asserted claims for (1) fraud against Mongie, Links Consulting, LinksCG, Sybrowsky, Lodging Dynamics, and Dynamic City; (2) breach of fiduciary duty against Mongie, Links Consulting, and LinksCG; (3) negligence against Mongie; (4) breach of the covenant of good faith and fair dealing against Mongie; and (5) securities fraud against Mongie, Links Consulting, Sybrowsky, Lodging Dynamics, and Dynamic City. [2]

¶16     After discovery, all of the defendants moved for summary judgment on all of Greene's claims. The district court held a combined hearing on all the motions and later issued an oral ruling granting summary judgment to all the defendants on all of Greene's claims.

¶17     With respect to the fraud claim, the district court identified the three statements by Mongie and Sybrowsky that Greene alleges were false statements as follows: (1) "Lodging Dynamics was a professional hotel management company dating back to the first Marriott Hotel franchise with numerous Marriott hotel properties in its portfolio"; (2) "Lodging Dynamics had a 30-year history and had a long track record of operational success, [including] that their investors were recovering 12 to 14 percent in dividends and 30 percent increase in their principal"; and (3) "Lodging Dynamics had successfully raised different funds to provide the equity portion of acquisition costs, [and] that they have done this with the bundling method several times in the

---

2. The district court granted a motion to dismiss the securities fraud claim against Sybrowsky, Lodging Dynamics, and Dynamic City. Greene did not appeal that ruling and later agreed to the dismissal of his securities fraud claim against Mongie and Links Consulting. Thus, that claim is not before us.

past." The court determined that the first two statements were not false and concluded that there was no question of a material fact of whether the third statement was made because the statement was merely an assumption made by Greene. The district court further found that even if the third statement had been made, Greene could not have reasonably relied upon it. Finally, the district court held that Dynamic City could not be liable on the fraud claim because no evidence was presented to the court "that Dynamic City acquired some or all of the hotel properties that were owned by . . . Lodging Dynamics."

¶18    For Greene's breach of fiduciary duty claim, the district court found that Mongie did not owe a duty to Greene because he was not "Greene's or the [T]rust's financial advisor" and further because Greene "retained control and responsibility for . . . making the decisions." The district court also concluded there was no breach because even if Mongie and Sybrowsky had a "backscratching" scheme, Mongie did not benefit financially from helping Greene. The court further found that LinksCG was not liable for the fraud or breach of fiduciary duty claims because there was no vicarious liability or actual or apparent authority.

¶19    Finally, the court ruled that all the claims were untimely because "any injury happened in 2014, and the action wasn't filed until November 13[], 2020."

ISSUE AND STANDARD OF REVIEW

¶20    On appeal, Greene argues the district court erred in granting summary judgment in favor of the defendants. "We review a district court's decision to grant summary judgment for correctness, granting no deference to the district court's conclusions." *Gillmor v. Summit County*, 2010 UT 69, ¶ 16, 246 P.3d 102 (cleaned up).

ANALYSIS

I. Fraud

¶21    Greene asserted a common law fraud claim against Mongie, Links Consulting, LinksCG, Sybrowsky, Lodging Dynamics, and Dynamic City. To prevail on a common law fraud claim in Utah, plaintiffs must prove nine elements:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 16, 70 P.3d 35 (cleaned up). Here, Greene's claim fails because he cannot identify any false representation that was made.

¶22    Greene concedes on appeal that each of the three statements identified by the district court "alone are not false." Because none of the challenged statements were false, Greene's fraud claim cannot survive summary judgment. To avoid this conclusion, Greene contends that the "district court erroneously determined that there were three separate statements at issue[,] . . . ignoring the totality of conduct and representations made by both Mongie and Sybrowsky." As Greene explains it, the "crux" of his fraud allegations is that Mongie and Sybrowsky "represented that Lodging Dynamics had achieved successful performance with past investments in *bundled* hotel funds, when in actuality the figures and history" of Lodging Dynamics "came

from the [special purpose entities] which [were] an entirely different" investment.

¶23 But there is no evidence that either Mongie or Sybrowsky ever represented to Greene that the prior success of Lodging Dynamics involved "bundled hotel funds." Indeed, Greene testified that it was merely an assumption that he made. When asked in his deposition if "it was [his] assumption that all of those hotels were held or acquired through funds rather than as individual properties," Greene responded that he "assumed that." And when asked specifically, "Did anybody tell you that?" Greene responded, "No. I didn't ask that question." Thus, as Greene himself admitted, neither Mongie nor Sybrowsky made any such representation. Therefore, the district court was correct in determining that neither Mongie nor Sybrowsky made any false statements and properly granted summary judgment on Greene's fraud claim.[3]

---

3. Moreover, even if there was a dispute as to whether Mongie or Sybrowsky made a false statement regarding the prior success of Lodging Dynamics, the district court was correct in granting summary judgment because Greene could not have reasonably relied on the statement. "[A] party cannot reasonably rely upon oral statements by the opposing party in light of contrary written information." *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1068 (Utah 1996); *see also Conder v. A.L. Williams & Assocs., Inc.*, 739 P.2d 634, 638 (Utah Ct. App. 1987) ("Where a plaintiff fails to read a contract without fault on the part of the defendant, . . . relief from the fraud is often denied." (cleaned up)). Here, Greene, a relatively sophisticated investor, received the PPM and subscription agreement before investing and chose not to read them. If Greene had read the PPM and subscription agreement, he would have read the subscription agreement's disclaimer of reliance on any representations made outside of the PPM, LLC

(continued…)

¶24    Greene also asserts fraud claims against Links Consulting and LinksCG, arguing that Mongie was their agent. And he asserts fraud claims against Lodging Dynamics and Dynamic City, arguing that Sybrowsky was their agent. But each of these claims is dependent on Greene's claims that Mongie and Sybrowsky made false statements concerning LD Hotel Fund I. Because we conclude that neither Mongie nor Sybrowsky made any false statements, *see supra* ¶¶ 21–23, Greene's fraud claim on the basis of agency also fails. *See* Restatement (Third) of Agency § 7.03(1) (Am. L. Inst. 2006) ("A principal is subject to direct liability to a third party harmed by an agent's conduct when . . . the agent's conduct is tortious or . . . the agent's conduct, if that of the principal, would subject the principal to tort liability . . . ."); *see also Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 51 n.45, 345 P.3d 531 (holding that the claim upon which summary judgment was granted in favor of the agent cannot serve as the basis of liability of the principal); *Holmstead v. Abbott G.M. Diesel, Inc.*, 493 P.2d 625, 627 (Utah 1972) ("[T]he exoneration of the servant removes the foundation upon which to impute [a tort] to the master."), *superseded by statute on other grounds as recognized in Krukiewicz v. Draper*, 725 P.2d 1349 (Utah 1986). Accordingly, we affirm the district court's grant of summary judgment to all the defendants on Greene's fraud claim.

## II. Breach of Fiduciary Duty

¶25    Greene asserted a claim of breach of fiduciary duty against Mongie, Links Consulting, and LinksCG. "Breach of fiduciary duty claims generally require proof of four elements: the existence of a fiduciary relationship (such as attorney-client, physician-patient, or insurer-insured); breach of the fiduciary duty; causation, both actual and proximate; and damages." *Gables at Sterling Village Homeowners Ass'n, Inc. v. Castlewood-Sterling Village*

---

agreement, and subscription agreement, and the direct statements in the PPM that this investment was the first of its kind.

*I, LLC*, 2018 UT 04, ¶ 52, 417 P.3d 95. Greene alleges that the district court erred in granting summary judgment on this claim because Mongie breached a duty owed to Greene. We disagree.

A.    The Life Insurance Policy

¶26    Greene alleges that Mongie breached his fiduciary duty by failing to cancel Greene's life insurance policy as Greene instructed and that Mongie's failure to cancel the policy was the but for and proximate cause of Greene's financial loss from the untimely cancellation. But because Greene has failed to show that Mongie ignored Greene's instructions to cancel the policy, there is no genuine issue of material fact as to whether Mongie breached his duty.

¶27    On July 1, 2016, a premium loan issued for Greene's life insurance policy because the returns from LD Hotel Fund I were insufficient to cover the premium. Later in 2016, Greene contacted Mongie and asked him to cancel the life insurance policy. Instead of canceling the policy, Mongie recommended to Greene that he allow Mongie to find Greene replacement coverage. Greene agreed, saying, "Let's do it." But Mongie was unable to find replacement coverage before the next renewal date on July 1, 2017, and a second loan was issued to cover the premium. On November 14, 2017, Greene emailed Mongie and Crabb and asked them to cancel the insurance policy, which Mongie did immediately.

¶28    Mongie did not breach his fiduciary duty in failing to cancel the policy before the 2016 or 2017 premium loans were issued. First, Greene had not requested that Mongie cancel the policy before the 2016 premium loan issued, so Mongie could not have breached his fiduciary duty by failing to cancel the policy when he was not instructed to do so before the loan issued. Second, after Greene asked Mongie to cancel the policy in late 2016, Mongie proposed finding alternative coverage, which

Greene agreed to. Thus, Mongie did not breach his fiduciary duty when he failed to cancel the policy prior to the 2017 loan issuing. Accordingly, the district court properly granted summary judgment on Greene's breach of fiduciary duty claim regarding the insurance policy.

B.     The Investment in Lodging Dynamics

¶29     Greene alleges Mongie breached his fiduciary duty to the Trust and MJG when he "engaged in self-dealing" and recommended that the Trust and MJG invest in Lodging Dynamics where he had an "ongoing business relationship with Sybrowsky and mutual back scratching." But because Greene has not shown that Mongie made the investment recommendation out of his own self-interest, there is no genuine issue of material fact as to whether Mongie breached any duty owed.[4]

¶30     First, Greene provided no evidence that Mongie received any financial benefit from Greene investing in Lodging Dynamics. Second, to support his "backscratching" argument, Greene points to (1) testimony from Crabb that Mongie would bring in investors and in return Sybrowsky would direct his family and Lodging Dynamics employees to Mongie to purchase life insurance policies, (2) emails that discussed the possibility of Mongie assisting Sybrowsky with his mother's estate, and (3) two emails where Mongie asked Sybrowsky for a friends and family discount at Marriott properties. But none of these incidents create a genuine issue of material fact as to whether Mongie engaged in any "backscratching."

---

4. Greene also failed to establish that Mongie owed any fiduciary duty to the Trust. Mongie's only relationship to the Trust was as a named successor co-trustee, and he never served in that capacity.

¶31 Crabb testified that he had no personal knowledge of Mongie selling life insurance policies to Sybrowsky and other Lodging Dynamics executives; he merely heard about it through others, making it inadmissible hearsay that cannot be used to demonstrate there is a genuinely disputed material fact. *See* Utah R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Utah R. Evid. 801, 802; *see also Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 41, 116 P.3d 271 (holding that a party opposing a motion for summary judgment must refute the moving party's assertions with admissible evidence and if only inadmissible hearsay is submitted, "[s]ummary judgment may . . . not be denied").

¶32 Further, Crabb testified that he made "an assumption" that Mongie referred investors to Sybrowsky in exchange for life insurance referrals, but he had no personal knowledge of any such referrals. Crabb's lack of personal knowledge makes his testimony inadmissible, and therefore, it cannot be used to demonstrate a disputed issue of material fact. *See* Utah R. Civ. P. 56(c)(2); Utah R. Evid. 602 ("A witness may testify to a matter only if . . . the witness has personal knowledge of the matter."); *cf. Randall v. Smith & Edwards Co.*, No. 1:20-cv-00183, 2023 WL 3742818, at *12 (D. Utah May 31, 2023) (holding that testimony from a witness that was "more of an assumption on his part" "is barred by [federal] Rule 602" (cleaned up)).[5]

¶33 Next, the emails between Mongie and Sybrowsky that discussed Mongie preparing a financial model for Sybrowsky's

---

5. Utah rule 602 is identical to federal rule 602. *Compare* Utah R. Evid. 602, *with* Fed. R. Evid. 602; *see also* Utah R. Evid. 602 advisory committee's note to 2011 amendment ("This is the federal rule, verbatim."). And Utah courts "may also rely on interpretations of similar federal rules by federal courts to assist our own interpretation." *Robinson v. Taylor*, 2015 UT 69, ¶ 10, 356 P.3d 1230.

family were sent in December 2016, more than two years after Greene invested in Lodging Dynamics. And they show only that Mongie and Sybrowsky discussed Mongie potentially preparing a financial model for Sybrowsky's mother's estate, not that he actually did.

¶34   Finally, the two emails where Mongie requested that Sybrowsky give him a friends and family discount at Marriott properties show only that Sybrowsky agreed to give Mongie, his longtime close friend, a hotel discount. Additionally, none of these emails were contemporaneous with Greene's investment in LD Hotel Fund I; one email was sent in February 2014, months before Greene invested in LD Hotel Fund I, and the other email was sent in 2015, the year after Greene invested.

¶35   Accordingly, neither Crabb's inadmissible testimony nor any of these emails demonstrates a genuine issue of material fact as to whether Mongie engaged in self-dealing or "backscratching." Thus, the district court correctly granted summary judgment on the claim that Mongie breached a fiduciary duty.

C.     Liability Based on Agency

¶36   Greene also alleges that Links Consulting and LinksCG are liable for breach of fiduciary duty because Mongie was acting as their agent. But, as we concluded above, *see supra* ¶¶ 26–35, Mongie is not liable for breach of fiduciary duty for failing to cancel Greene's life insurance policy or for recommending that the Trust and MJG invest in LD Hotel Fund I. Thus, neither Links Consulting nor LinksCG is liable for breach of fiduciary duty because Greene's claims against these two entities depend on Mongie acting as their agent. And where the agent is not liable, the principal cannot be liable for the agent's actions. *See* Restatement (Third) of Agency § 7.03(1) (Am. L. Inst. 2006); *see also Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 51 n. 45, 345

P.3d 531; *Holmstead v. Abbott G.M. Diesel, Inc.*, 493 P.2d 625, 627 (Utah 1972), *superseded by statute on other grounds as recognized in Krukiewicz v. Draper*, 725 P.2d 1349 (Utah 1986).

### III. Negligence and Breach of the Covenant of Good Faith and Fair Dealing

¶37 Greene asserts that the district court erred when it granted summary judgment on both his negligence and breach of the covenant of good faith and fair dealing claims against Mongie on the ground that they were barred by the applicable statute of limitations. Mongie urges this court to affirm the grant of summary judgment on these two claims on the alternative ground that Greene has not established the elements of either claim. We agree with Mongie and elect to affirm on this alternative ground alone. *Harman v. 105 Partners, LLC*, 2024 UT App 109, ¶ 53, 556 P.3d 669 (affirming dismissal on an "[alternative] basis alone"); *Okelberry v. West Daniels Land Ass'n*, 2005 UT App 327, ¶ 11, 120 P.3d 34 ("It is well established that we may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action . . . ." (cleaned up)).

### A. Negligence

¶38 Greene contends that Mongie acted negligently in connection with Greene's investment in LD Hotel Fund I. Greene asserts that Mongie had a duty to act in the best interest of Greene, the Trust, and MJG because he was acting as "Greene's (unlicensed) financial advisor." Greene further argues that Mongie breached that duty "when he acted in his own self-interest and advised Greene . . . to invest in Lodging Dynamics," and that this breach proximately caused Greene's losses from the failure to cancel the life insurance policy.

¶39 "The essential elements of a negligence claim incorporate virtually the same requirements as a breach of fiduciary duty claim." *Gables at Sterling Village Homeowners Ass'n, Inc. v. Castlewood-Sterling Village I, LLC*, 2018 UT 4, ¶ 55, 417 P.3d 95 (cleaned up). To prove a negligence claim, "a plaintiff must show a duty of reasonable care owed by the defendant to [the] plaintiff," while to prove a breach of fiduciary duty claim, "the plaintiff must demonstrate the existence of a fiduciary relationship between the plaintiff and the defendant, which gives rise to a particularized and enhanced duty of care." *Id.* ¶ 56 (cleaned up). Both claims require the plaintiff to show a breach of the duty, causation, and damages. *Id.* ¶¶ 52, 55. The main "[d]ifference between a negligence claim and a breach of fiduciary duty claim therefore lies mainly in the type of duty owed." *Id.* ¶ 56.

¶40 As we explained above, Greene failed to establish a genuine issue of material fact regarding whether Mongie acted in his own self-interest and thus breached his fiduciary duty. *See supra* ¶¶ 29–35. Because the breach elements of a fiduciary duty claim and a negligence claim are "virtually the same," *see Gables at Sterling Village*, 2018 UT 4, ¶ 56, we need not reassess any alleged breach by Mongie for purposes of Greene's negligence claim.

¶41 Therefore, even assuming Mongie owed Greene a duty as his financial advisor, Greene has not established that there is a genuine issue of material fact as to whether Mongie breached the duty owed to Greene, the Trust, or MJG for purposes of their negligence claim. Thus, the district court properly entered summary judgment in Mongie's favor.

B. Breach of the MJG Operating Agreement

¶42 Greene asserts that MJG's operating agreement contains an implied covenant of good faith and fair dealing that "imposed a duty on Mongie to perform in a good faith manner . . . and refrain

from decisions and recommendations" that would injure MJG members' interests. Greene alleges Mongie breached this duty when he recommended that Greene invest "1 million dollars of MJG's assets in Lodging Dynamics based on self-interest and self-dealing," which caused the loss of one million dollars of MJG's assets.

¶43　While Greene alleges that Mongie breached the operating agreement because his investment recommendation was in his self-interest, Mongie received no compensation for being the manager of MJG, nor did he receive any benefit from Greene investing MJG's funds in Lodging Dynamics. Further, MJG's operating agreement contained a limitation of liability provision that managers of MJG cannot be held liable unless their action or omission was fraudulent, in bad faith, or constituted gross negligence or willful misconduct. And as discussed above, *see supra* ¶¶ 21–24, Greene has not shown that Mongie engaged in fraud, nor has he provided any evidence of bad faith, gross negligence, or willful misconduct. Therefore, the district court correctly granted summary judgment in favor of Mongie on Greene's claim for breach of MJG's operating agreement.

## CONCLUSION

¶44　The district court did not err when it granted summary judgment to the defendants on Greene's claims for fraud, breach of fiduciary duty, negligence, and breach of the implied covenant of good faith and fair dealing. We therefore affirm the grant of summary judgment.

––––––––––